**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| 1. ERIC LASHAUN GUICE,<br>Plaintiff,<br>vs.<br>**1. COMANCHE COUNTY FACILITIES AUTHORITY, an Oklahoma public trust;**<br>**2. DAVID WEBER, also identified in records as DAVID WEBBER, individually;**<br>**3. MICHELLE BARLOW, individually;**<br>**4. CLIFFORD DARRINGTON, individually;**<br>**5. LISA MYERS, individually;**<br>**6. DETENTION OFFICER LAAMOW, first name presently unknown, individually;**<br>**7. COMANCHE COUNTY HOSPITAL AUTHORITY, a public trust, d/b/a COMANCHE COUNTY MEMORIAL HOSPITAL;**<br>**8. JOHN/JANE DOE 1, individually;**<br>**9. JOHN/JANE DOE 2, individually;**<br>**10. JOHN/JANE DOE 3, individually;**<br>**11. JOHN/JANE DOE 4, individually;**<br>**12. JOHN/JANE DOE 5, individually;**<br>**13. JOHN/JANE DOE 6, individually;**<br>**14. JOHN/JANE DOE 7, individually;**<br>**15. JOHN/JANE DOE 8, individually;**<br>**16. JOHN/JANE DOE 9, individually;**<br>**17. JOHN/JANE DOE 10, individually;**<br>**18. JOHN/JANE DOE 11, individually; and**<br>**19. JOHN/JANE DOE 12, individually,**<br>Defendants. | **Case No. CIV-26-02062-G** |

## AMENDED COMPLAINT AND JURY DEMAND

COMES NOW Plaintiff Eric LaShaun Guice ("Mr. Guice"), by and through counsel, and for his claims against Defendants Comanche County Facilities Authority ("CCFA"); David Weber, also identified in records as David Webber ("Weber"), individually; Michelle Barlow ("Barlow"), individually; Clifford Darrington ("Darrington"), individually; Lisa Myers ("Myers"), individually; Detention Officer Laamow, first name presently unknown

("Laamow"), individually; Comanche County Hospital Authority, a public trust, doing business as Comanche County Memorial Hospital ("CCHA/CCMH"); and John/Jane Does 1-12, individually, alleges and states as follows:

## NATURE OF THE CASE

1. This case arises from a preventable group assault inside the Comanche County Detention Center ("CCDC") during the night of August 24, 2024 and the early morning of August 25, 2024.

2. While Mr. Guice slept in a crowded housing unit, approximately nine inmates attacked him with hard food trays and, as Mr. Guice has reported, improvised sharp objects or shivs, cutting his head and face, breaking his arm and orbital wall, and severely injuring his left eye.

3. Mr. Guice was confined, dependent on jail staff for his safety, and unable to choose his housing, lock his own cell, summon outside help, remove weapons from other inmates, or obtain medical care on his own.

4. Mr. Guice recalls that he was asleep by approximately 11:15 p.m. and was attacked while sleeping; jail records document that staff discovered him at approximately 12:45 a.m., at a door, striking it with a food tray and covered in blood.

5. The precise start time and duration of the assault remain to be established through discovery, but the known facts show that a violent group attack continued or went undetected long enough to inflict extensive injuries before staff intervened.

6. The failure to detect the attack sooner was not an unforeseeable accident. Months before the assault, regulators had documented overcrowding, floor sleeping, deficient

classification, missed or undocumented sight checks, inadequate direct supervision, and medical-record and observation failures at CCDC.

7. In May 2024, regulators observed two inmates sleeping on the floor in Pod 251, the same pod identified in the incident report concerning Mr. Guice's assault three months later.

8. The pre-midnight roster identifies a third-floor rover, and the post-midnight roster identifies Cpl. Myers as the third-floor officer; neither roster identifies a dedicated third-floor-control operator, and the post-midnight roster expressly leaves that separate control post blank, supporting the reasonable inference that no officer continuously operated the third-floor camera, intercom, and door-control station during the critical period.

9. CCDC's own housing records show that Barlow assigned Mr. Guice to cell 252-2 on August 13, 2024, shortly after Mr. Guice's records reflected a fight and a keep-separate override.

10. CCDC's written policies required controlled housing assignments, direct supervision, hourly visual checks, count verification, and functioning intercom and monitoring systems. Those protections existed on paper but failed in practice.

11. Once officers found Mr. Guice, they provided first aid and summoned emergency medical services. Mr. Guice does not base this action on a claim that those responding officers withheld the ambulance after discovering him.

12. The constitutional failure began earlier: Defendants left a known dangerous and overcrowded housing environment inadequately classified, inadequately staffed, inadequately watched, and inadequately secured until the very risk about which they had been warned became a prolonged group assault.

13. The institutional failure continued after the emergency. Hospital providers ordered orthopedic follow-up within one week and retinal follow-up within two weeks, but the records presently available show no timely orthopedic visit and no retinal visit until approximately thirty days after the assault.

14. CCHA/CCMH was identified as CCDC's medical authority, supplied or controlled on-site medical personnel, and participated in the system through which detainees depended on jail and medical staff to receive outside care.

15. Mr. Guice brings claims under 42 U.S.C. section 1983 for failure to protect, unconstitutional conditions of confinement, deliberate indifference to serious medical needs, and unconstitutional entity policies, customs, and practices.

16. Mr. Guice also pleads a distinct Fourteenth Amendment conditions-of-confinement theory based on the prolonged, institutionally maintained combination of overcrowding, insecure sleeping arrangements, uncovered control posts, and deficient direct supervision.

## THE PARTIES

17. Plaintiff Eric LaShaun Guice is a natural person who was confined at CCDC in Comanche County, Oklahoma, on August 24 and 25, 2024.

18. At all relevant times, Mr. Guice was wholly dependent on Defendants and their personnel for physical safety, housing security, emergency rescue, medical transportation, medication, and follow-up care.

19. Defendant CCFA is an Oklahoma public trust that operated, managed, controlled, staffed, funded, supervised, or was otherwise legally responsible for CCDC during the relevant period.

20. CCFA exercised operational authority over CCDC, maintained or controlled its records, received jail headcount information, participated in housing-plan review, and responded as custodian for records concerning Mr. Guice and the assault.

21. On information and belief, Comanche County is CCFA's sole beneficiary.

22. CCFA possessed the authority and practical ability to adopt, fund, enforce, and correct CCDC staffing, housing, classification, supervision, security, and medical-coordination practices.

23. CCFA is a person subject to suit under 42 U.S.C. section 1983 for its own policies, customs, practices, decisions, and failures to train or supervise.

24. CCFA is sued for constitutional injuries caused by its own policies, customs, practices, final decisions, and deliberately indifferent failures to train and supervise.

25. The Board of County Commissioners of Comanche County, Oklahoma ("BOCC") is the governing board of Comanche County, Oklahoma, and is the entity through which the County may be sued.

26. The BOCC is Comanche County's governing and chief fiscal body, approves county contracts and encumbrances, and, on information and belief, made county funding, payment, and contracting decisions concerning CCFA, detainee housing, and detention-related expenditures during the relevant period.

27. Mr. Guice does not seek to impose section 1983 liability on CCFA merely because it employed a wrongdoer.

28. Defendant David Weber is also identified in public and jail records as David Webber.

29. By May 2024, Weber was CCDC's Interim Jail Administrator, acting administrator, or person in charge, and he became or was approved as the full-time Jail Administrator in July 2024, before the assault.

30. CCDC policies placed administrator-level responsibility on Weber for count schedules, inmate-location verification, daily headcount reporting, housing-plan review, policy enforcement, staffing accountability, and correction of known operational deficiencies.

31. State regulators addressed a May 2024 noncompliance letter directly to Weber as CCDC Administrator and identified serious deficiencies that included the same classification, supervision, sight-check, overcrowding, and medical-system dangers that later affected Mr. Guice.

32. Weber is sued in his individual capacity for his own decisions, policy implementation, knowing failure to correct dangerous practices, and affirmative link to the conditions that caused Mr. Guice's injuries.

33. On information and belief, Weber had authority to change or require changes in staffing, post assignments, classification, housing security, sight checks, intercom and camera monitoring, contraband control, incident response, and coordination of outside medical care, or to obtain corrective action from CCFA and the BOCC.

34. Weber acted as a final policymaker, a delegated policymaker, or a senior official whose knowing implementation and maintenance of the challenged practices directly caused the constitutional violations alleged here.

35. Defendant Michelle Barlow is identified in CCDC and regulatory records as Captain Michelle Barlow and in the housing system as BARLOW, M.

36. Captain Michelle Barlow and the person identified as BARLOW, M. are the same CCDC supervisory official.

37. Barlow held captain-level supervisory, classification, housing, incident-response, and inmate-safety responsibilities during the relevant period.

38. CCDC housing records show that BARLOW, M. personally entered or approved Mr. Guice's August 13, 2024 assignment to cell 252-2 after Mr. Guice's records reflected a recent fight and a keep-separate override.

39. Barlow is sued in her individual capacity for her own housing and classification decisions, knowing maintenance of unsafe conditions, supervisory actions and omissions, and deliberate failure to protect Mr. Guice from a substantial risk of serious harm.

40. Mr. Guice does not sue Barlow merely because Barlow held a supervisory title.

41. Defendant CCHA is an Oklahoma public trust doing business as Comanche County Memorial Hospital.

42. A May 2024 CCDC contact record identified "Comanche Co. Hospital" as the facility's medical authority and stated that a registered nurse was on site.

43. CCHA/CCMH's own disclosures in related CCDC litigation identify healthcare providers associated with the CCDC medical unit, supporting the allegation, made on

information and belief, that CCHA/CCMH provided, controlled, supervised, or participated in jail medical services during the relevant period.

44. On information and belief, CCHA/CCMH acted under color of state law by performing the government's delegated and constitutionally required function of providing or arranging medical care for detainees who could not obtain care for themselves.

45. CCHA/CCMH is sued under section 1983 for its own policies, customs, practices, training, supervision, staffing, record systems, and outside-care coordination failures.

46. Defendant Clifford Darrington was a CCDC lieutenant and the rostered supervisor for the 4:00 p.m.-to-midnight shift on August 24, 2024. CCDC personnel records identify his full name, and the shift roster bears his initials and call sign in the end-of-shift review field.

47. On information and belief, Darrington knew during the outgoing shift that Laamow was the only identified third-floor rover and that no separate third-floor-control operator was assigned. He is sued individually for maintaining that coverage without requiring effective alternative monitoring or heightened checks despite the obvious conditions alleged below, not because of his title alone.

48. Defendant Lisa Myers was a CCDC corporal identified on the midnight-to-8:00 a.m. roster as the shift supervisor and, simultaneously, as both a first-floor rover and the third-floor officer. The roster identifies no person in the separate third-floor-control post and bears Myers's initials and call sign in the end-of-shift review field.

49. On information and belief, during the period between midnight and discovery at approximately 12:45 a.m., Myers knew that third-floor control was unassigned and failed to provide or perform effective alternative monitoring despite her concurrent assignments and

the obvious conditions alleged below. Mr. Guice does not allege that Myers selected the roster, caused the assault to begin, violated an hourly-check deadline merely because discovery occurred forty-five minutes into the shift, or responded improperly after discovery.

50. Defendant Detention Officer Laamow, whose first name is presently unknown, was the sole identified third-floor rover during the 4:00 p.m.-to-midnight shift in which Mr. Guice recalls the assault beginning. On information and belief, if the assault began before midnight as Mr. Guice presently recalls, Laamow failed during that interval to maintain active third-floor patrol, perform required visual observation, or obtain effective coverage, allowing the assault or its aftermath to remain undetected. Mr. Guice does not presently allege that Laamow actually saw or heard the assault, and does not sue him merely because his name appeared on a roster.

51. John/Jane Does 1-4 are additional floor, control, master-control, relief, or coverage officers whose own pre-discovery conduct caused the attack to go undetected. John/Jane Does 5-8 are additional classification personnel, housing decision makers, shift supervisors, or watch commanders whose own decisions caused unsafe placement, inadequate separation, missed checks, insecure-cell practices, or ineffective control coverage. John/Jane Does 9-12 are CCDC or CCHA/CCMH medical personnel, supervisors, referral coordinators, records personnel, or custody officials whose own conduct caused the medically ordered follow-up to be missed or delayed. Each Doe is sued individually only for that Doe's own acts and omissions, and the true names and exact conduct are reflected in records controlled by Defendants.

52. Mr. Guice will seek prompt discovery and leave to substitute the Doe Defendants' true names when identified.

53. At all relevant times, Weber, Barlow, Darrington, Myers, Laamow, and the Doe Defendants acted under color of state law as public employees, public officials, governmental contractors, or persons performing delegated governmental functions.

54. At all relevant times, CCFA and CCHA/CCMH acted through final policymakers and through policies, customs, practices, decisions, omissions, training, supervision, staffing, and record systems attributable to each entity.

## JURISDICTION AND VENUE

55. This Court has subject-matter jurisdiction under 28 U.S.C. sections 1331 and 1343 because Mr. Guice brings claims under the United States Constitution and 42 U.S.C. section 1983.

56. This Court has authority to award all legal and equitable relief available for the federal constitutional violations alleged in this Complaint.

57. Venue is proper in the Western District of Oklahoma under 28 U.S.C. section 1391 because the events and omissions giving rise to these claims occurred in Comanche County, Oklahoma.

58. Comanche County lies within the Western District of Oklahoma.

59. Defendants reside in, perform governmental functions in, conduct business in, or are otherwise subject to personal jurisdiction in Oklahoma.

60. On August 24 and 25, 2024, Mr. Guice was confined at CCDC awaiting adjudication in State of Oklahoma v. Eric Lashun Guice, Comanche County District Court

Case No. CF-2024-383. That case was filed on July 8, 2024; bond was set at $100,000 on July 9; and no preliminary hearing, trial, conviction, judgment, or sentence had occurred by the time of the assault.

61. Mr. Guice had been released from DOC confinement in 2022 on the ten-year sentence entered in Comanche County Case No. CF-2018-137. CCDC's booking record for the July 8, 2024 arrest identifies no DOC detainer or parole-revocation hold, and CF-2024-383 remained pending until a jury acquitted Mr. Guice of both charges on August 21, 2025. Mr. Guice was therefore a pretrial detainee on the relevant dates and pleads his federal claims under the Fourteenth Amendment.

62. As a pretrial detainee, Mr. Guice could not be subjected to punitive conditions or deliberate indifference to his safety and serious medical needs.

63. The individual Defendants' conduct occurred within the scope of their work at CCDC, except to the extent any Defendant contends that unconstitutional conduct fell outside that scope.

64. The institutional Defendants' challenged policies, customs, and decisions were made or maintained in Oklahoma and caused injury in Oklahoma.

65. This action is commenced within Oklahoma's two-year limitations period governing section 1983 claims arising from the August 24-25, 2024 events.

## PLEADING MATTERS AND INFORMATION WITHIN DEFENDANTS' CONTROL

66. Mr. Guice pleads this Complaint under Federal Rules of Civil Procedure 8, 10, 11, and 15.

67. Allegations drawn directly from records presently available to Mr. Guice are pleaded as facts.

68. Allegations concerning Defendants' internal knowledge, communications, motives, assignments, record routing, policymaker allocations, and other matters controlled by Defendants are pleaded on information and belief where the known facts support a reasonable inference and the confirming evidence is likely to emerge through discovery.

69. The records presently available establish more than a speculative possibility: they show advance regulatory warnings, repeated operational deficiencies, floor sleeping in the same pod, a blank third-floor control assignment, a recent fight and keep-separate entry, Barlow's later housing assignment, a delayed discovery of a bloody group assault, and missed medically ordered follow-up deadlines.

70. For allegations specifically identified as based on information and belief, evidentiary support is expected after a reasonable opportunity for further investigation or discovery.

71. Mr. Guice does not possess the complete video, electronic door data, intercom data, sight-check audit trails, classification communications, staffing explanations, medical referral records, or internal communications needed to identify every responsible person and decision.

72. CCFA has stated that incident video or audio, to the extent it existed, was overwritten in early 2025, while separately identifying a recorded call between Officer Brewer and Captain Barlow that still exists but has not been produced, making the remaining recordings, logs, rosters, reports, audit trails, and testimony especially important.

73. Defendants should not benefit at the pleading stage from their exclusive control over identifying information or from the loss, overwriting, or nonpreservation of evidence once available to them.

74. References to conduct by an institutional Defendant mean conduct attributable to that entity through a final policymaker, an official decision, a widespread and persistent custom, deliberately indifferent training or supervision, ratification, or another basis recognized under section 1983.

75. Allegations pleaded in the alternative are permitted and are not admissions that any particular Defendant lacks responsibility.

76. The exact division of responsibility among CCFA, Weber, Barlow, Darrington, Myers, Laamow, CCHA/CCMH, and the Doe Defendants is uniquely suited for early discovery and does not defeat the plausible claims alleged against each.

77. Mr. Guice incorporates factual allegations against each Defendant only to the extent they concern that Defendant's own conduct, knowledge, authority, policies, customs, or causal role.

78. Mr. Guice seeks no vicarious section 1983 liability based solely on respondeat superior.

79. Mr. Guice reserves no claim merely through boilerplate; the claims asserted are those expressly stated below, subject to amendment when discovery identifies additional responsible persons or corrects information controlled by Defendants.

## FACTUAL ALLEGATIONS

### A. CCDC Controlled Every Protection Mr. Guice Needed

80. CCDC controlled Mr. Guice's cell assignment, cell lock, movement, separation from other inmates, access to staff, and access to emergency and follow-up medical care.

81. CCDC maintained written policies governing inmate accountability, counts, sight checks, direct supervision, housing assignments, intercommunication, and electronic monitoring.

82. Those policies made the Jail Administrator responsible for establishing count schedules and times for verifying inmate locations.

83. The policies required daily headcount summaries to be transmitted to Facilities Authority members, connecting jail population and housing conditions to CCFA oversight.

84. The policies required celled inmates to be locked in for formal counts so staff could verify each person's identity and location.

85. The policies required visual sight checks of inmates at least hourly.

86. The policies required those checks to be recorded, allowing supervisors and policymakers to identify missed rounds and unsafe units.

87. The policies placed cell and bed assignments under staff control rather than inmate choice.

88. The policies required direct supervision, patrol, and observation of occupied housing areas.

89. Electronic surveillance could supplement those duties but did not replace required staff observation and response.

90. CCDC used or was supposed to use intercom, camera, door, and control systems to permit communication and rapid response in housing areas.

91. Reasonable classification required staff to assess violence history, keep-separate information, physical characteristics, gang affiliation, conflicts, vulnerability, and compatibility before assigning housing.

92. Reasonable housing practices required Defendants to account for overcrowding, inmates sleeping outside secure cells, open or unlocked cells, and the number and compatibility of people with access to a detainee while he slept.

93. Reasonable security practices required Defendants to control improvised weapons, sharp objects, food trays used as weapons, and coordinated group violence.

94. Reasonable staffing required enough trained personnel at assigned posts to conduct checks, monitor doors and cameras, hear distress signals, enforce separation, and intervene before an attack became catastrophic.

95. CCDC also maintained a medical unit and depended on designated medical personnel or a designated medical authority for assessment, records, referral, emergency escalation, and outside-care coordination.

96. Once an outside provider ordered specialty follow-up, Mr. Guice could not schedule, travel to, or attend that care unless jail and medical personnel processed the order and transported him.

97. In May 2024, CCDC identified Comanche County Hospital as its medical authority and reported an on-site registered nurse.

98. CCHA/CCMH, CCFA, and CCDC each possessed records capable of identifying which entity and which persons were responsible for the on-site medical unit and outside referrals in August 2024.

99. These duties were not administrative formalities. They were the mechanisms meant to prevent a confined person from being beaten without detection and then losing access to time-sensitive care.

100. Had Defendants reasonably classified and secured the housing unit, staffed and monitored the third floor, performed required checks, and responded to distress promptly, the attackers would have been separated, deterred, detected, or interrupted sooner.

101. Had Defendants reliably routed and tracked the discharge orders, Mr. Guice would have received the ordered one-week orthopedic and two-week retinal evaluations on time.

102. The failures alleged below arose from connected practices and policymaker choices, not merely one employee's unpredictable departure from an otherwise functioning system.

## B. Defendants Had Repeated Warning of the Same Dangers

103. Before August 2024, state detention-facility inspections and complaints repeatedly warned CCDC officials about failures bearing directly on inmate safety and medical care.

104. A 2023 inspection identified deficiencies in classification and housing documentation.

105. A 2023 incident record described staff hearing banging from a housing floor and later finding an inmate unresponsive; the corresponding post roster showed that third-floor control was not manned during that incident.

106. Staff interviews in that investigation established that, when CCDC was short-staffed, intercom traffic was rerouted to third-floor control because another floor was not staffed and its boards were turned off. Regulators found that CCDC had failed to maintain a staffed communication and monitoring location capable of emergency response.

107. On May 14, 2024, approximately three months before Mr. Guice's assault, regulators found CCDC not in substantial compliance with applicable detention standards.

108. The resulting noncompliance correspondence was addressed directly to Weber as Administrator.

109. Regulators found required classification or housing documentation absent or deficient.

110. Regulators found sight-check logs missing, incomplete, or unreliable.

111. Regulators found required visual checks had not been conducted or documented as required.

112. Regulators identified inadequate direct supervision and observation of confined persons.

113. Regulators documented overcrowding and inmates sleeping on floors rather than in secure assigned beds.

114. Most importantly here, regulators observed two inmates sleeping on the floor in Pod 251.

115. Regulators observed additional floor sleepers elsewhere in the facility, confirming a broader and persistent crowding practice rather than a one-time anomaly.

116. CCDC personnel represented that floor-sleeping placements were assigned through classification, placing responsibility for those conditions on jail decision makers rather than on inmates alone.

117. Regulators also identified deficiencies in medical assessment, medical observation, and medical records. The May 2024 findings included an unsigned and undated medical assessment, 115 and 160 missed required hourly checks for two inmates on increased observation, and failures to document medication administration and medical encounters.

118. Those deficiencies impaired the facility's ability to identify serious needs, communicate orders, document care, and ensure that required follow-up occurred.

119. Regulators identified deficiencies relating to emergency or serious-injury reporting and review.

120. On information and belief, these failures remained substantially uncorrected on August 24, 2024 because later staffing, housing, assault, and medical records reflect the same operational breakdowns.

121. Weber had actual notice through the letter addressed to him, the inspection materials he was responsible for answering, his administrator duties, and the reports and records that ordinarily reached his office.

122. CCFA had actual or constructive notice through daily headcounts, housing-plan review, regulator communications, trust oversight, staffing and budget records, incident reports, and its direct operational role.

123. On information and belief, CCHA/CCMH received notice of deficiencies in the jail medical unit through its identified medical-authority role, personnel associated with the unit, records, recurring communications with CCDC, and operation of the systems through which outside care was arranged; the precise notices are controlled by CCHA/CCMH and CCFA.

124. Barlow personally encountered Mr. Guice's classification and housing information. On information and belief, Darrington and Myers, as shift supervisors, received supervisor briefings, post orders, inspection or corrective-action information, and prior-incident instruction concerning missed checks, short-staffed intercom routing, and the earlier unmanned third-floor-control post. On information and belief, Laamow received the third-floor post orders and knew from his own assignment and direct observations that no dedicated control operator was covering the floor.

125. CCDC records also reflected fights and violent incidents before Mr. Guice's assault, including a fight associated with Mr. Guice's own housing history earlier in August.

126. On August 5, 2024, Mr. Guice's housing records reflected a fight and a keep-separate override before he was moved again.

127. A reasonable jail official would understand that chronic overcrowding, insecure sleeping arrangements, deficient classification, missed checks, and an unstaffed control post combine to create an obvious risk of coordinated inmate violence.

128. A reasonable jail official would also understand that a detainee with documented conflicts or separation information requires a deliberate compatibility and safety review before reassignment.

129. A reasonable medical authority would understand that deficient records and referral tracking create an obvious risk that time-sensitive discharge orders will never become actual appointments.

130. Despite repeated notice and time to act, Defendants maintained the same dangerous conditions until they injured Mr. Guice.

### C. Barlow Placed Mr. Guice Back Into a Known Dangerous Housing System

131. Mr. Guice entered CCDC custody before the assault and underwent a housing or classification assessment.

132. The assessment recorded information relevant to safe placement, including Mr. Guice's comparatively small build, history of issues or violence, and stated gang affiliation.

133. That information required careful placement and separation decisions; it did not authorize Defendants to expose Mr. Guice to a coordinated group assault.

134. On August 5, 2024, CCDC placed Mr. Guice in cell 339-4 with a keep-separate override and a notation concerning a fight in another housing area.

135. The fight and override put classification and supervisory staff on notice that ordinary, unexamined reassignment could expose Mr. Guice or others to further violence.

136. On August 13, 2024, a CCDC user identified as BARLOW, M. assigned Mr. Guice to cell 252-2.

137. BARLOW, M. was Defendant Michelle Barlow, who had authority to review Mr. Guice's classification history and select, approve, or override his placement.

138. The August 25 incident report identifies the location of the assault as Pod 251.

139. Mr. Guice's cell history identifies his assignment as cell 252-2, and a later regulatory inspection expressly locates cell 252 in Pod 251.

140. The precise location where Mr. Guice was required to sleep, the position and status of his cell door, and the means by which the attackers reached him are reflected in documents and electronic data controlled by Defendants and are proper subjects of discovery.

141. Barlow had access to or responsibility for reviewing Mr. Guice's recent fight notation, keep-separate entry, classification factors, current enemies or conflicts, bed availability, and the crowding conditions in the assigned unit.

142. On information and belief, Barlow reviewed or was responsible for reviewing Mr. Guice's recent fight and keep-separate history before assigning him to cell 252-2, knew facts from which a substantial risk of renewed violence or incompatible group housing could be inferred, and drew that inference or confronted a risk so obvious that her knowledge may be inferred.

143. On information and belief, Barlow nevertheless approved the assignment without an adequate compatibility investigation, documented separation plan, secure sleeping arrangement, or reliable supervision plan.

144. On information and belief, Does 6-8 approved, maintained, or failed to correct the same unsafe assignment despite access to Mr. Guice's records and the known conditions in Pod 251.

145. On information and belief, Barlow and Does 6-8 failed to investigate whether the recent fight and keep-separate entry implicated any inmate with access to Pod 251 or otherwise

made the placement unsafe, and failed to implement an adequate separation plan before or after assigning Mr. Guice to cell 252-2.

146. Because of overcrowding, floor sleeping, open-cell practices, deficient locks, or staff-approved housing arrangements, multiple inmates could reach Mr. Guice while he slept.

147. On information and belief, Mr. Guice's cell or sleeping area was not locked or otherwise secured against entry by the group that attacked him.

148. Approximately nine inmates were able to gather, coordinate, enter or reach his sleeping area, and assault him without prompt staff intervention.

149. The attackers had access to hard food trays and, as Mr. Guice has reported, improvised sharp objects or shivs, as well as other items capable of inflicting severe injury; discovery will establish the trays' composition and the precise instruments used.

150. No officer was close enough, watching effectively enough, or checking frequently enough to stop the group before extensive injuries occurred.

151. The known risk created by deficient classification, crowding, insecure housing, inadequate staffing, and missed supervision materialized in precisely the kind of serious inmate violence those safeguards were designed to prevent.

**D. No Dedicated Third-Floor Control Operator Detected the Assault**

152. CCDC's roster for the 4:00 p.m. to midnight shift on August 24, 2024 identifies Darrington as shift supervisor and D/O Laamow as the third-floor rover but does not identify a separate officer assigned to operate third-floor control.

153. CCDC's roster for the midnight to 8:00 a.m. shift on August 25, 2024 identifies Lisa Myers as supervisor and simultaneously assigns her as a first-floor rover and the third-

floor officer, while separately including a third-floor-control line and leaving that control post blank.

154. Darrington's roster reflects eight staff, including two relief officers assigned to inmates at CCMH; Myers's roster reflects six staff, assigns Myers three concurrent functions, notes an officer call-in, and lists no dedicated third-floor-control operator.

155. The absence of any identified dedicated third-floor-control operator spanned both sides of the midnight shift change and the period during which the assault began and was discovered.

156. On information and belief, no trained officer continuously staffed third-floor control, watched the relevant camera feeds, monitored intercom traffic, controlled doors, or maintained direct awareness of Pod 251 during the critical period.

157. On information and belief, leaving the dedicated control function uncovered resulted from chronic understaffing, an accepted post-assignment practice, a funding decision, a supervisory choice, or a custom of leaving required control functions unattended.

158. Any cameras or electronic systems available on the third floor were ineffective without a person continuously watching them and empowered to respond.

159. Required rounds, sight checks, counts, or direct observations were not performed with sufficient frequency and attention to discover and stop the attack promptly.

160. At approximately 11:15 p.m. on August 24, according to Mr. Guice's present recollection, he fell asleep or was asleep in his assigned housing area.

161. He was not attacking another inmate, threatening staff, or voluntarily participating in a mutual fight when the group descended on him.

162. Approximately nine inmates attacked him together.

163. They punched, kicked, struck, cut, and beat him while he was outnumbered and unable to protect himself.

164. They used hard food trays and, as Mr. Guice has reported, improvised knives or shivs, together with other hard or sharp objects, as weapons.

165. The blows opened numerous wounds in Mr. Guice's face and scalp, fractured his left arm and orbital wall, damaged his eye, and caused substantial blood loss.

166. On information and belief, the attack generated banging, shouting, movement, distress, or other sounds and visual signs that adequate direct supervision, functioning intercom monitoring, or attentive camera monitoring would have detected.

167. No officer intervened while the attackers remained in the housing area long enough to inflict the documented pattern of wounds.

168. At approximately 12:45 a.m., Officers Brewer and Chavez were conducting a count or floor check and went to third-floor control to turn on lights and check the pods.

169. They then saw Mr. Guice at a door, striking it with a food tray and covered in blood.

170. The incident report does not describe an assigned third-floor-control officer alerting them, a camera monitor summoning them, or an intercom call bringing them to the scene before that count.

171. The known record therefore supports the inference that staff discovered Mr. Guice because officers arrived for a count, not because CCDC's continuous supervision or emergency-communication systems worked.

172. By the time staff found him, the group had been able to inflict injuries requiring staples, sutures, fracture care, hospital transfer, and specialty evaluation.

173. The precise duration of the attack is presently unknown, but it lasted or went undetected materially longer than it would have in a reasonably staffed, monitored, classified, and secured housing unit. On information and belief, the attack, the assailants' access, or the immediate danger continued into the post-midnight shift; in all events, Mr. Guice remained gravely injured and undiscovered until approximately 12:45 a.m.

174. Hourly checks alone were inadequate for a crowded and violent unit, and on information and belief even the required checks and counts were missed, delayed, superficial, or not meaningfully verified.

175. The uncovered dedicated control post and deficient checks gave the attackers the time, privacy, access, and numerical advantage needed to carry out the assault.

176. Weber knew the staffing and count systems, received headcount and inspection information, and had authority to correct blank posts, deficient rounds, and policy noncompliance before the assault, yet maintained or knowingly tolerated practices that left the third floor without effective control.

177. On information and belief, Darrington knew the outgoing staffing arrangement during his shift and possessed authority to require effective alternative monitoring or heightened checks. The roster bears his initials in an end-of-shift review field, which corroborates review but does not by itself establish when he first reviewed or selected the plan.

178. Myers was the incoming supervisor and was herself assigned on the roster to the first and third floors while the separate third-floor-control post remained blank. On

information and belief, during the period between midnight and discovery at approximately 12:45 a.m., she knew the post was unassigned and failed to provide or perform effective alternative third-floor monitoring. Her alleged causal role is limited to prolonging any post-midnight exposure or delaying discovery and rescue, not causing the assault to begin.

179. Barlow knew or had access to Mr. Guice's housing and classification risks, encountered the crowded and insecure conditions in her captain-level work, and personally participated in the placement that exposed Mr. Guice to them.

180. As the sole identified outgoing third-floor rover, Laamow personally encountered the crowded conditions he patrolled and was responsible for meaningful rounds and visual observation. On information and belief, if the assault began before midnight as Mr. Guice presently recalls, Laamow failed during that interval to maintain active patrol, perform the required visual observation, or obtain effective coverage, allowing the assault or its aftermath to remain undetected. This allegation does not assume that Laamow actually saw or heard the assault. Does 1-8 failed to perform or enforce the particular additional functions assigned to each.

181. Mr. Guice's injuries were the foreseeable result of the very dangers identified in prior inspections, apparent in the deficient shift rosters, and present in his housing record. The individual Defendants did not need to know the precise identity of every attacker or exact minute of attack to understand the longstanding and obvious substantial risks within their own responsibilities.

182. After Brewer and Chavez discovered Mr. Guice, they called supervisory staff, entered the area, removed him, and began a response.

183. Cpl. Myers called emergency medical services, and responding staff applied pressure, stopped bleeding, bandaged Mr. Guice's head, and assisted until EMS arrived.

184. Barlow received a call at approximately 1:02 or 1:05 a.m., was told about the head wound and need for hospital care, and directed that Mr. Guice go to the hospital by ambulance.

185. Mr. Guice credits those post-discovery actions and does not allege that Brewer, Chavez, Myers, or the other identified responders deliberately withheld emergency transport once they found him.

186. That response does not excuse the earlier deliberate failures that allowed the assault to occur and remain undetected, or the later failure to carry out time-sensitive specialty follow-up.

### E. Mr. Guice Required Emergency Hospital Care

187. After staff removed Mr. Guice from the pod, he collapsed outside master control.

188. He was bleeding from multiple head and facial wounds and had visible trauma requiring immediate emergency care.

189. CCDC staff rendered first aid until EMS assumed care.

190. EMS transported Mr. Guice to Comanche County Memorial Hospital.

191. Hospital records reflect physician evaluation beginning at approximately 1:30 a.m. and emergency services by approximately 1:43 a.m.

192. Mr. Guice had an altered Glasgow Coma Scale score of approximately 13, extensive lacerations, severe eye findings, and arm pain.

193. Providers documented multiple deep lacerations to his scalp, face, forehead, and eyebrow.

194. Repair required approximately eighteen staples and sixteen sutures.

195. Imaging confirmed a left distal-ulna fracture.

196. Imaging and examination also showed a left orbital medial-wall fracture, herniation or displacement involving the medial rectus muscle, hemorrhage behind or around the eye, and impaired eye movement.

197. Because of the seriousness of the orbital and eye injuries, CCMH arranged transfer to the University of Oklahoma Medical Center at approximately 2:52 a.m.

198. Mr. Guice arrived at OU at approximately 4:36 a.m. and received trauma, ophthalmology, and other specialty evaluation.

199. Ophthalmology documented commotio retinae or traumatic retinal injury, impaired vision, and a guarded prognosis.

200. Providers treated the emergency wounds, evaluated the fractures and eye trauma, and returned Mr. Guice to custodial control with time-sensitive follow-up instructions.

201. The injuries were neither minor nor hidden; their seriousness was obvious to custody staff, medical staff, supervisors, and any official who reviewed the incident and hospital records.

202. On August 26, 2024, Barlow personally checked on Mr. Guice after he had been moved to cell 122.

203. Mr. Guice told Barlow he remained hurt and described conflict within the prior pod.

204. Barlow stated or decided that Mr. Guice would not be returned to that pod, confirming Barlow's awareness that the former placement was unsafe.

205. Barlow's post-assault contact, the ambulance call, the hospital transfers, and the obvious wounds gave her actual knowledge that Mr. Guice had suffered serious injuries requiring continuing care.

206. CCFA and responsible CCDC personnel received incident, transport, return-to-custody, medical-unit, and housing records documenting the serious injuries, and, on information and belief, the records or their material contents were routed to Weber and to the identified medical authority through CCDC's serious-injury and medical-return processes.

**F. Defendants Did Not Carry Out Time-Sensitive Follow-Up Orders**

207. OU providers instructed that Mr. Guice receive orthopedic follow-up for the arm fracture within approximately one week.

208. Ophthalmology instructed that he receive retina or macular-specialist follow-up within approximately two weeks.

209. The eye-service record stated that the clinic would schedule the appointment and identified the Lawton detention setting or custodial contact as the means to reach Mr. Guice.

210. Mr. Guice could not call specialists, arrange transportation, leave CCDC, obtain his own records, or ensure that outside providers communicated with one another.

211. CCHA/CCMH was CCDC's identified medical authority, and, on information and belief, the on-site registered nurse or medical unit served as the point through which outside-care orders were to be received and implemented.

212. CCHA/CCMH's related-case disclosures identified nursing, medical-assistant, and advanced-practice personnel associated with the CCDC medical unit.

213. On information and belief, CCHA/CCMH participated in or controlled the medical side of discharge-order intake and referral coordination, while Does 9-12 performed the receiving, entry, referral, scheduling, transportation, tracking, escalation, or supervisory functions assigned to each person.

214. On information and belief, CCFA, Weber, and responsible custody supervisors shared responsibility for ensuring that serious post-hospital orders were delivered to the medical unit and that Mr. Guice was transported when required.

215. On information and belief, discharge papers accompanied Mr. Guice when he returned to custody or were transmitted through established hospital-to-custody or hospital-to-medical channels; alternatively, the personnel assigned to receive and process those materials deliberately failed to obtain them despite the obvious need for continued fracture and eye care.

216. On information and belief, the persons who received or processed the discharge materials knew of the ordered follow-up, and the persons assigned to intake, referral, transportation, tracking, or supervision deliberately failed to use the established systems necessary to carry those orders into completed visits.

217. The medical records presently available do not show that Mr. Guice received the ordered orthopedic follow-up within one week, and on information and belief no timely orthopedic visit occurred.

218. The medical records presently available show no retina-specialist evaluation within the ordered two weeks.

219. Mr. Guice's first documented Dean McGee Eye Institute follow-up occurred on September 24, 2024, approximately thirty days after the assault and approximately two weeks after the ordered follow-up window had expired.

220. The available eye records reflect visual acuity of approximately 20/50+2 shortly after the assault and approximately 20/800 at the September 24 visit.

221. Later evaluation documented severe outer-retinal atrophy with subfoveal involvement, impaired central vision, double vision, and a guarded prognosis for the left eye.

222. Mr. Guice does not presently allege that the follow-up delay alone caused every component of his permanent eye injury; the assault itself caused grave trauma, and medical causation will be developed through expert discovery.

223. The delay nevertheless caused or contributed to avoidable pain, prolonged symptoms, lack of the ordered specialty reevaluation, increased medical risk, and loss of an earlier opportunity to evaluate and treat complications.

224. On information and belief, the missed deadlines resulted from absent or deliberately inadequate policies for discharge-order intake, referral tracking, appointment confirmation, custody-medical communication, transportation, escalation, and supervisory review.

225. The May 2024 findings concerning medical assessment, observation, and records gave Weber, CCFA, and responsible CCDC medical supervisors advance notice that existing custody-medical systems exposed detainees with serious needs to record and continuity

failures; on information and belief, CCHA/CCMH separately knew of referral-system deficiencies through its identified medical-authority role, participating personnel, records, and communications.

226. Defendants control the referral logs, communications, scheduling attempts, transportation records, medical-unit chart, and audit trails that will identify the precise persons, omissions, and entity policies responsible for the missed follow-up.

## COUNT I - FAILURE TO PROTECT

*42 U.S.C. section 1983 - Fourteenth Amendment*
*Against Weber, Barlow, Darrington, Myers, Laamow, and John/Jane Does 1-8, Individually*

227. Mr. Guice re-alleges paragraphs 1-12, 17-18, 28-40, 46-54, 60-79, and 80-206 as if fully set forth here.

228. Mr. Guice faced a substantial and objectively serious risk of group violence because of deficient classification, a recent fight and keep-separate entry, overcrowding, floor sleeping, insecure housing, accessible weapons, missed checks, and the absence of effective third-floor control.

229. Weber knew of that risk through the May 2024 findings addressed to him, earlier incidents, staffing and housing information, headcounts, policy duties, and the obvious consequences of leaving known deficiencies uncorrected.

230. Barlow knew of that risk through Mr. Guice's classification and housing record, Barlow's personal assignment decision, the conditions she encountered as a captain, and known crowding and violence at CCDC.

231. On information and belief, Darrington received supervisor briefings, post orders, and inspection or corrective-action information concerning the 2023 incident in which third-

floor control was unmanned, the short-staffed intercom routing, and the May 2024 missed-check and direct-supervision findings. Together with the obvious crowded and insecure conditions he encountered and the staffing arrangement he knew, that information caused him actually to perceive a substantial risk of undetected inmate violence. Mr. Guice does not rely solely on Darrington's title, tenure, or access to records.

232. On information and belief, Myers received supervisor briefings, post orders, and inspection or corrective-action information concerning the same monitoring and check failures. Together with the obvious conditions she encountered and the concurrent assignments she knew, that information caused her actually to perceive a substantial risk that post-midnight violence or an injured detainee on the third floor would remain undetected.

233. On information and belief, Laamow actually perceived a substantial risk of undetected inmate violence through his third-floor post orders, the crowded and insecure conditions he personally patrolled, his knowledge that no dedicated control operator was covering the floor, and the obvious danger of allowing a large group to gather around or enter a sleeping detainee's area without intervention.

234. On information and belief, each of Does 1-8 actually drew the substantial-risk inference through the particular Doe's floor, control, supervisory, classification, housing, or coverage assignment; direct observations; required logs and records; prior incidents; and the obvious conditions encountered in that role. The named Defendants' knowledge is pleaded separately in paragraphs 229-233.

235. Weber deliberately failed to correct, enforce, or obtain correction of staffing, supervision, sight-check, classification, housing, monitoring, and security practices despite authority and time to do so.

236. Barlow deliberately assigned or maintained Mr. Guice in unsafe housing without adequate conflict investigation, separation, secure placement, classification review, or a documented safety plan despite known risk factors.

237. Despite the risk he perceived, Darrington, on information and belief, failed to require effective alternative monitoring, heightened checks, or another reasonable protective measure during the portion of his shift in which Mr. Guice reports the assault began.

238. Despite the risk she perceived, Myers, on information and belief, failed between midnight and approximately 12:45 a.m. to provide or perform effective alternative third-floor monitoring. Mr. Guice does not allege that the 12:45 count itself violated an hourly-check requirement, that Myers caused the assault to begin, or that her post-discovery EMS response was improper.

239. On information and belief, if the assault began before midnight as Mr. Guice presently recalls, Laamow failed during that interval to maintain active third-floor patrol, perform the required visual observation, or obtain effective coverage, allowing the assault or its aftermath to remain undetected. Mr. Guice does not presently allege that Laamow actually saw or heard the assault. Does 1-8 deliberately failed to perform or enforce the particular additional function assigned to each person's role.

240. Count I relies on the defendant-specific knowledge and conduct alleged in paragraphs 229-239. It does not rely on collective knowledge, supervisory title, mere access to records, or negligence.

241. Weber and Barlow allegedly contributed to the dangerous systems and placement that permitted the assault; Darrington and Laamow allegedly contributed during the pre-midnight interval if Mr. Guice's recalled timing is proven; Myers allegedly contributed only to post-midnight nondetection or delayed rescue before discovery; and each Doe is liable only for the role-specific conduct separately alleged.

242. Before August 2024, Supreme Court and Tenth Circuit law clearly established that jail officials who actually know chronic understaffing, deficient monitoring, missed checks, prior violence, and insecure housing expose detainees to serious inmate assault may not consciously leave a housing area without meaningful observation or fail to take available reasonable measures to detect, prevent, or interrupt that violence.

243. The conduct separately alleged against each individual Defendant violated Mr. Guice's Fourteenth Amendment rights and proximately caused only the constitutional injury and damages attributable to that Defendant's own conduct and time period.

244. Their reckless and deliberately indifferent conduct supports compensatory damages and punitive damages against each individual Defendant whose state of mind is proven at trial.

## COUNT II - DELIBERATE INDIFFERENCE TO SERIOUS MEDICAL NEEDS

*42 U.S.C. section 1983 - Fourteenth Amendment*
*Against Weber and John/Jane Does 9-12, Individually*

245. Mr. Guice re-alleges paragraphs 13-14, 17-18, 28-34, 41-54, 60-79, 95-102, 103-130, and 187-226 as if fully set forth here.

246. Mr. Guice's orbital fracture, retinal trauma, impaired vision, arm fracture, sutured and stapled wounds, pain, and ordered specialty care were objectively serious medical needs.

247. The seriousness of those needs was obvious, documented in hospital and incident records, communicated through discharge instructions, and known to officials who saw Mr. Guice or reviewed his care.

248. Weber had actual knowledge of the systemic medical-record and observation deficiencies identified in May 2024 and, as Administrator, controlled or was responsible for the custody-side systems for serious-injury reporting, return from outside treatment, discharge-paper routing, transportation, and coordination with the jail medical unit.

249. On information and belief, Weber personally maintained, enforced, or failed to correct those custody-medical routing and coordination systems despite advance notice that CCDC's medical documentation and observation systems were deficient and despite the obvious need for a reliable process after a detainee returned from emergency hospital treatment.

250. Does 9-12 received, reviewed, entered, scheduled, transported, tracked, supervised, or were assigned to act on the one-week orthopedic and two-week retinal orders.

251. On information and belief, the Does assigned to referral, scheduling, transportation, or supervisory tracking knew that one or both appointments had not been

timely made or attended and failed to correct the omission despite the obvious risk of continuing pain and unresolved fracture or eye injury.

252. Weber deliberately maintained or failed to correct the custody-side systems necessary to route and implement serious discharge orders, and, on information and belief, Does 9-12 deliberately avoided, disabled, or failed to use the particular record, referral, transportation, or communication functions assigned to them even though the need and risk were obvious.

253. On information and belief, the individual Defendants delayed or interfered with medically ordered care through deliberate institutional inattention, deficient tracking, lack of transportation coordination, or an accepted practice of not ensuring that urgent referrals became completed visits.

254. For each liable individual, the alleged conduct was not a reasonable medical disagreement or mere inadvertence; it reflected conscious disregard of a known and substantial risk to a detainee with obvious trauma.

255. Before August 2024, it was clearly established that a custodial official who personally knew that a confined person had suffered a fracture and severe orbital and retinal trauma, knew that hospital specialists had directed orthopedic follow-up within approximately one week and retinal follow-up within approximately two weeks, knew that failure to secure that care exposed the person to continuing serious pain or a substantial risk of further serious harm, and had a personally assigned gatekeeping function and practical ability to secure that care, could not deliberately refuse, substantially delay, or functionally deny access to the ordered specialist care without taking reasonable measures to abate the known risk. The

emergency care already provided does not, by itself, defeat liability if the responsible gatekeeper later functionally denied the ordered specialist access. This claim does not rest on a missed appointment deadline or violation of discharge instructions alone, but on personal responsibility, subjective knowledge of the substantial risk, practical ability to act, and conscious failure to perform the assigned gatekeeping function.

256. The conduct of Weber and Does 9-12 violated Mr. Guice's Fourteenth Amendment rights.

257. Their violations caused or contributed to avoidable pain, prolonged symptoms, delayed evaluation, increased medical risk, loss of a timely treatment opportunity, and other physical and emotional harm.

258. The extent to which the delay worsened Mr. Guice's permanent orthopedic or visual outcome will be established through medical records, testimony, and expert discovery and is not necessary to the existence of his delay-related constitutional injury.

259. The reckless and deliberately indifferent conduct of each responsible individual Defendant supports compensatory damages and punitive damages as allowed by law.

## COUNT III - UNCONSTITUTIONAL FAILURE-TO-PROTECT POLICIES, CUSTOMS, AND PRACTICES

*42 U.S.C. section 1983 - Fourteenth Amendment*
*Against CCFA*

260. Mr. Guice re-alleges paragraphs 1-12, 17-40, 46-54, 60-79, and 80-186 as if fully set forth here.

261. CCFA, through its jail policymakers, maintained and implemented the operational policies and customs challenged here.

262. Those policies, customs, and practices included chronic understaffing and uncovered control posts, including no identified third-floor-control officer on either relevant roster and an expressly blank third-floor-control line on the midnight roster.

263. They included missed, superficial, undocumented, or unverified sight checks and counts and the failure to supervise or discipline staff for noncompliance.

264. They included deficient classification, failure to honor or meaningfully investigate keep-separate information, incompatible housing, and reassignment without adequate conflict review.

265. They included chronic overcrowding, floor sleeping, open or insecure sleeping arrangements, uncontrolled movement, inadequate locks or door practices, and insufficient separation of detainees.

266. They included inadequate camera and intercom monitoring, deficient emergency communications, inadequate contraband and weapon control, and reliance on electronic systems without personnel assigned to watch and respond.

267. They included deliberately indifferent failures to train and supervise administrators, captains, classification staff, control staff, floor officers, and shift supervisors in the performance and enforcement of those duties, including physical sight checks and allocating control and intercom coverage during recurring staff shortages.

268. The policies and customs were persistent and widespread, reflected in repeated inspections, complaints, incidents, housing records, staffing records, missing logs, and daily operating conditions rather than a single unauthorized departure from policy. For example,

the May inspection identified repeated failures to document required checks on March 24 and May 12–14, 2024, and obstructed sight lines within the housing pods.

269. CCFA's final policymakers had actual notice through the 2023 and May 2024 findings, the letter to Weber, floor sleeping in Pod 251, population and headcount reports, rosters, incidents, and the obvious consequences of the challenged conditions.

270. CCFA had direct operational, record, staffing, policy, housing-plan, and oversight responsibility and consciously chose to continue the challenged practices.

271. The challenged policies, customs, and deliberate-indifference failures were moving forces behind the unsafe placement, lack of effective supervision, delayed discovery, group assault, and severity of Mr. Guice's injuries.

272. CCFA is therefore liable for the resulting constitutional injuries and compensatory damages under section 1983.

## COUNT IV - UNCONSTITUTIONAL MEDICAL-CARE POLICIES, CUSTOMS, AND PRACTICES

*42 U.S.C. section 1983 - Fourteenth Amendment*
*Against CCHA/CCMH and CCFA*

273. Mr. Guice re-alleges paragraphs 13-14, 17-24, 28-34, 41-54, 60-79, 95-102, 117-123, and 187-226 as if fully set forth here.

274. On information and belief, CCHA/CCMH acted under color of state law in its identified medical-authority function and participated in the medical-unit systems through which outside-care orders for detainees were received, communicated, referred, or tracked.

275. CCFA maintained or failed to correct custody-side policies and customs that did not reliably deliver discharge orders to the medical unit, coordinate transportation, track completion, or escalate a missed time-sensitive appointment.

276. On information and belief, CCHA/CCMH separately maintained or participated in medical-authority practices that did not reliably intake outside orders, create and monitor referrals, communicate with specialists and custody staff, use deadline alerts, obtain supervisory review, or escalate when an ordered appointment did not occur.

277. The May 2024 medical-assessment, observation, and record deficiencies gave CCFA advance notice that CCDC's medical systems exposed detainees with serious needs to continuity failures; on information and belief, CCHA/CCMH had separate notice from its medical-authority records, participating personnel, recurring communications, and the absence of completed referrals within the ordered windows.

278. CCHA/CCMH's final medical policymakers and CCFA's final jail policymakers knew the obvious consequence of those practices and maintained them with deliberate indifference.

279. CCFA remained constitutionally responsible for ensuring access to necessary care even when it delegated medical functions to CCHA/CCMH or medical personnel.

280. CCFA's custody-routing and transportation practices and, on information and belief, CCHA/CCMH's medical-intake and referral practices were each moving forces behind the missed one-week orthopedic follow-up, delayed retinal evaluation, avoidable pain, prolonged symptoms, increased risk, and loss of a timely treatment opportunity.

281. CCHA/CCMH and CCFA are therefore liable under section 1983 for the medical-care injuries and compensatory damages caused by their own unconstitutional policies, customs, and practices.

## COUNT V - UNCONSTITUTIONAL CONDITIONS OF CONFINEMENT

*42 U.S.C. section 1983 - Fourteenth Amendment*
*Against CCFA, Weber, and Barlow*

282. Mr. Guice re-alleges paragraphs 1-12, 17-40, 46-54, 60-79, and 80-186 as if fully set forth here.

283. The combined conditions in and around Pod 251 included chronic overcrowding, inmates sleeping outside secure assigned beds, open or insecure sleeping arrangements, deficient classification and separation, an uncovered third-floor-control post, inadequate direct supervision, ineffective monitoring, and insufficient protection from group violence.

284. Those were institutionally maintained conditions that persisted from at least the May 2024 inspection through Mr. Guice's August 2024 assault, not a momentary departure by a single employee.

285. Exposing a pretrial detainee to that combination of conditions was not rationally related to a legitimate nonpunitive purpose and, alternatively, was excessive in relation to any asserted objective involving cost, crowding, staffing convenience, or administrative efficiency.

286. CCFA knowingly maintained those operational conditions through its final policymakers; Weber personally maintained the administrator-level staffing, supervision, and corrective systems; and Barlow personally maintained Mr. Guice's unsafe classification and housing placement.

287. CCFA had notice through inspections, reports, budgets, funding requests, contracts, population data, and daily operations; Weber and Barlow had actual knowledge through the specific administrator, inspection, classification, housing, and operational facts alleged above and deliberately disregarded the risks within their respective authority.

288. The conditions permitted approximately nine inmates to reach Mr. Guice while he slept, arm themselves, coordinate, and inflict extensive injuries before staff discovered the assault.

289. The own conduct of CCFA, Weber, and Barlow, as separately alleged, subjected Mr. Guice to punishment and objectively unreasonable conditions in violation of the Fourteenth Amendment and caused his resulting damages.

## DAMAGES

290. As a direct and proximate result of Defendants' conduct, Mr. Guice suffered severe physical injury, pain, blood loss, scarring, fractures, retinal damage, impaired vision, double vision, emotional distress, humiliation, fear, loss of normal life activities, medical expenses, and other past and future losses.

291. Mr. Guice seeks compensatory and nominal damages against each Defendant to the extent allowed by law and punitive damages against each individual Defendant whose reckless, callous, or deliberately indifferent state of mind is proven.

292. Mr. Guice also seeks reasonable attorneys' fees and costs under 42 U.S.C. section 1988, prejudgment and postjudgment interest, and all other relief allowed by law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Eric LaShaun Guice requests judgment in his favor and against each Defendant on the claims and relief proven against that Defendant, and requests:

A. Compensatory and nominal damages in amounts determined by the jury or otherwise allowed by law;

B. Punitive damages against the individual Defendants whose conduct satisfies the governing standard;

C. Reasonable attorneys' fees, costs, and expenses under 42 U.S.C. section 1988 and other applicable law;

D. Prejudgment and postjudgment interest as allowed by law;

E. Leave to substitute the true names of John/Jane Does 1-12 after prompt discovery identifies them; and

F. Such other and further relief as the Court deems just and proper.

## JURY DEMAND

293. Mr. Guice demands a trial by jury on all issues so triable.

Respectfully submitted,

**ATTORNEY LIEN CLAIMED**

*s/Jason Hicks*

Jason M. Hicks, OBA #22176
LAIRD, HAMMONS, LAIRD, PLLC
1332 S.W. 89th Street
Oklahoma City, OK 73159
Telephone: (405) 703-4567
Facsimile: (405) 703-4061
Email: jason@lhllaw.com
ATTORNEY FOR PLAINTIFF